On the 10th October, 1814, the Court delivered their opinions.
.Tilghman C. J.
(After stating the case).' The applicants ■have complied on their part with every thing required by law, and now demand their patent agreeably to the certificate and survéy returned, by the commissioners. To this several objec.tions are made on behalf of the commonwealth. It is said that the.first certificate is void, because Thomas Cooper was not a ■commissioner at the. time he signed it-, and that the second is void, because Alexander Scott being interested, could not lawfully act as a commissioner. These objections must be clearly ■established before they <¡;an prevail. Both Cooper and Scott acted as commissioners, and their acts have been in other instances recognised by the officers of the commonwealth ; and the objections are of such a nature as gives reason to suppose that- they were not known or not understood by the public-Scott's interest, ifhehad any, was of a private nature; and the exception to Cooper arises upon a point of law; viz. that having ■been appointed, and having acted as President-of the Courts of Common Pleas in one of the judicial, districts of the commonwealth, his office of commissioner was .thereby vacated. This objection is severe from the mouth of the. commonwealth, under whose authority Mr. Cooper was appointed to both offices, and perhaps the commonwealth ought not to- be permitted to dispute the authority of its own commissioner, whatever might be the law as to private .persons. -But granting the objection to be as strong on behalf of the. commonwealth as of an individual, let us examine the force- of it. By the Constitution of Pennsylvania, art. 5, sect. 2, it is declared that the Judges of the Supreme Court and Presidents of . the several Courts of. Common Pleas « shall not hold any other “ office of profit under this commonwealth.” To Mr. Cooper the office of commissioner was not in-fact an office pf profit, because he did not receive a cent as commissioner from the *10 time that he acted as a judge. ' But it is said that his not re» ceiving his pay makes no difference as to the nature of his 0g¡cej by which he was entitled to a compensation of three dollars and fifty cents for every day in which he was employecp Supposing it to be so, the office which he held does not appear to me to be within the meaning of the Constitution. It was rather the execution of a special commission, than the holding of an office, and this certainly was the opinion of the legislature ; because by the Constitution, art. 2,. sect. 8, “ the “ Governor shall appoint all officers whose. offices are esta- “ blished by this Constitution, or shall be established by /aw, “ and whose appointments are not herein otherwise provid» “ éd for.” Now then, if a commissioner under the act of April, 1799, was an officer within the meaning of the Constitution, the appointment of him belonged to the Governor; whereas all the commissioners were named hi the act, by Which the office was. established. Nor is this the only instance in which points of this kind have been brought before the legislature. By the Constitution, art. 1, sect. 18, “ no “ person holding any office, (except of attorney at law and in “ the militia), under the United States or this commonwealth, “ shall be a member of either house, during his continuance “ in office.” ' Charles Biddle, Esq. a member of the senate of Pennsylvania, was appointed by the President of the United States to act as á commissioner to sign certain bills or notes, called treasury notes, issued under the authority of an act of Congress, for which he received-a compensation. The matter was brought before the senate, who decided that his seat was not vacated. On the strength of these, precedents, and from the extreme inconvenience' which would, result from avoiding all the acts of a person who was de facto a commissioner, I am of opinion that Mr.- Cooper was a lawful commissioner when he signed the certificate.
I will now consider the objection to Mr. Scott. He had received from a certain Peter Hogeboom, by deed dated 8th August, 1794, a conveyance of an undivided fourth part of the township of Claverack (in which the -land claimed by the plaintiffs is situated) which was held by Hogeboom by a title derived from the state of Connecticut. Scott and his wife afterwards conveyed to William Hull, by deed dated 22d " 'Match, 1796, all the said undivided fourth part, except 1300 acres, to which they had a right derived from the- state of *11 Pennsylvania. This deed contains a special warranty against the grantors and all claiming under them, and expressly provides that no other or better right is intended to be conveyed than that which Scott had acquired from Hogeboom, viz. a title- under the state of Connecticut, or the Susquehanna Company, and- that the right of the said Scott to the 1300 acres claimed under a Pennsylvania title, should be in no way impaired by the said deed. And by another deed, dated the same 22d March, Scott and wife conveyed to the said Hull, in consideration of g 250, all the interest which the said Scott had acquired to the said. 1300 acres of land, under the said deed from Hogeboom: it being expressly understood “ that the “claim of said Scott under Pennsylvania to the said 1300 “ acres should not be impeached, altered, or in any way impaired, but that his claim under Pennsylvania, at law and “ in equity, should be the same as though the said deed had “not been-executed.” These writings were drawn with a studied anxiety to avoid all responsibility on the part of Scott. He sold the Connecticut title such as he had received it and no otherwise; and his warranty is expressly confined to himself and those-who may claim under him. Therefore he was in no-way interested in the Connecticut title. All objections to the persons of the commissioners being thus removed, it remains to consider the exceptions which have been taken to •their acts. . .
- 1.' It is said that it should appear by the certificate that the land ivas surveyed in tracts of three or four hundred acres, each of which should have been separately valued. It is not ■expressly directed.by the act of 1799, that this shall be done where one person is owner of a large quantity. To the commonwealth it makes no difference whether there be one or -many surveys, provided the whole quantity be valued in the manner directed by law; and that it has been so valued the commissioners, certify. There is one point of view indeed, in which the interest of the commonwealth is affected'by a survey of - such extraordinary dimensions. The fees of patents: are a branch of public revenue; and there is no reason ’why. that source should be diminished by so unprecedented a patentas ..that which is asked for. But there need be no difficulty on.'that score. I ■ understand that the applicants will agree to pay the same fees as if the land had been divided into tracts of the usual size.
*12 2. It. is said that islands ought not to be included in the survey.. But no reason has been assigned in support of this assertion.; The act of 1799 makes no exception of islands. The commissioners certify that. the islands are the property of . the applicants, regularly assigned to them, or those under whoni they claim, prior to the decree at Trenton. That being the case there is no .ground for distinction between islands and other lands. ...
' 3. It has been attempted to be proved that the lands included in the survey returned by the commissioners were not settled prior to the decree of Trenton. This objection would only lie against Shepherd's certificate. As to Dorrance it could have no effect; because by an act of assembly passed April 9th, 1807, (prior to Dorrance's certificate) the commissioners are authorised to proceed in cases where the .lands were not occupied- prior to the decree at Trenton. But even with respect to Shepherd's. certificate I do not see how the time of settlement can now be inquired into, because the commissioners have certified that the settlement was prior to the - decree at Trenton. So far .as the title was in the com-, monw.ealth, the legislature might dispose of it, at its pleasure.. .The commissioners are appointed by the commonwealth and vested with power to decide on the right of the Connecticut, settler, and upon their decision and certificate a patent is to be issued. It could not have been intended that-matters of this kind should remain open to.investí gatiori, because by the act. of 6th April, 1.802, sect. 10, it is made the duty-.ofjthe commissioners “to demand-and receive of, and “from, each-Connecticut settler, and claimant applying for a “.certificate, every deed and document of title under the “ Susquehanna-Company relating to the lands required to be “ certified, which may be. in the power or possession of such “ Connecticut settler or claimant previous to the issuing of “. any certificate for such lands.” The situation of a Connect ticut man maybe difficult enough in supporting a contest with an individual who claims under a prior Pennsylvania title; but hard indeed would be his case, if after delivering-up his papers he. should have to contend with the common- ■ ivealth. I take, for granted, that every thing is fair between the commissioners and the Connecticut claimants ; that there has been neither corruption, fraud, nor collusion. Any circumstance of that kind would form an exception. But *13 nothing like it is suggested. Under these circumstances I am of opinion that between the commonwealth and the Connecticut claimant the certificate of the commissioners is conclusive. On the merits of the case then, the applicants are entitled to a patent. But there may be reason to doubt whether the survey which has been returned be accurate. As to the islands there are no data by which to examine it; for no courses or distances are given. The quantity of land is large, and it would be unreasonable that a patent should issue while any doubt remains respecting the accuracy of the survey. I am therefore of opinion that there should be a resurvey before we make our final decree.
Yeates J.
The act which gives us jurisdiction in the present instance directs that we shall hear and determine all matters and things touching the legality of the certificates granted to the plaintiffs, and their right to 12,328 acres of land, or any part thereof, in Claverack, and decree and determine in the case, as lato and justice may require, which decree shall be final. Our decision, therefore, is not confined to the return made by the secretary of the commonwealth, on the rule to shew cause why he should not affix the great seal to the mammoth patent, made out and subscribed by Andrew JEllicott, late secretary of the land office, Upon the 15th March, 1809; but the whole merits, of the case, under all its circumstances, are open to our consideration, and we are to do equal right to the contending parties in the dernier resort.
The validity of the certificates signed by the commissioners has been much questioned. It is objected, that Thomas Cooper, Esq., having been commissioned President of the Courts of Common Pleas of the fourth judicial district, on 1st August, 1804, and of the eighth judicial district on 8th March, 1806, could not legally subscribe the certificate granted to John Shepherd on 2d January, 1807, by reason of the concluding words of the 2d section of the fifth article of the state Constitution; “ the presidents of the several Courts of “ Common Pleas shall receive for their services an adequate “ compensation to be fixed by law, but they shall receive no “fees or perquisites of office,nor hold any other office of profit under this" commonwealth.”
Mr. Cooper was appointed a commissioner on the 22d April, 1801, and proceeded to- act immediately in that cha *14 meter.' • It is admitted that he received no pay whatever for 'his acts as commissioner, subsequently to 1st August, .1804, the date of his first commission -as president. • Governor M'-Kean must .have considered at the time, how far his completion of official transactions, previously begun in the capacityof a-commiss-i oner,-would be -repugnant to the true meaning of the Constitution,1 provided he sought no compensation for such -services.- Shepherd made his application to the commissioners, as a Connecticut claimant, so early as 12th November, 1-800; and it appears, from the minutes of those commissioners, that they- and their successors proceeded to investigate his claim. I have never heard it objected against Mr. Cooper, that it was mal-conduct in him as a judge to sign such certificates* -Certainly it was not amongst the charges exhibited- against him to the legislature. Nor, independently.of the provisions of the Constitution, do I discover that incompatibility of the two-offices-of judge and commissioner, which has been ascribed, to them by the counsel on the part of the state, at any time prior to the signature of Shepherd’s certificate. ■ I do not see, antecedently to that period, that either under the original act of 4th April,. 1799, or its two supplements, of 6th April, 1802, and 4th April, 1805, the va-r lidity of such certificates could be questioned, or any contests as to title between Pennsylvania and Connecticut claimants could- possibly arise, before the Presidents of the Courts of Common Pleas.- - '
- T consider, however, the present case as fairly distinguishable -from-the plaintiff’s prosecuting an action against individuals "claiming under Pennsylvania titles'; because the same. chief executive magistrate appointed Mr.■ Cooper commissioner and -president, — -his reports as a- commissioner, although he sat as a judge, have -been -received and acted upon by the legislature, — *and certificates signed~by him and another commissioner, after he -had come upon the bench, have been-uniformly recognised by the board of property. The decisions-of-the-commissioners are declared bylaw to be binding as between Connecticut claimants, and every deed and document of the plaintiff’s title under the Susquehanna Company relating to the lands certified, have been delivered up to the commissioners undpr the 10th section of the act of 6th April, 1802.' It would, ill comport with-the honour and dignity,of..the; state,; — it.-would be -manifestly unjust, under *15 such circumstances, in my idea, that the title of thet plaintiffs should be deemed invalid as against the commonwealth, on the ground of a supposed illegality of the appointment of a commissioner as a judge, in which by any possibility they could have neither agency nor controul.
In the appointment of Alexander Scott as a commissioner who subscribed the certificate granted to Benjamin JDorrance on the 1st January, 1808, I perceive nothing which can render it illegal. Peter Hogeboom., on the 8th August, .1794», conveyed Clave rack township to Mr. Scott and three others, with covenants against all persons claiming under Connecticut.¡ or the Susquehanna Company, and that he had a good right to sell and dispose of the premises. But when Scott and wife executed their deed to William Hull on 27th March, 1796, for the one undivided fourth part of these lands, they conveyed with a covenant of special warranty against Scott himself and his heirs, and the express intention of the parties was declared to be that Scott’s right under Hogeboom was alone transferred. It therefore clearly appears that Mr. Scott was in no wise interested, when he joined in the certificate. How far it, might be expedient to appoint him as .a commissioner, if it had been known that he had previously purchased under the Connecticut title, was a matter to be judged of by the executive magistrate who nominated him to that office.
,. The general provisions of. the act for taking up islands in the river Susquehanna do not apply to the present claim'. The object of the confirming law was to restore peace and quiet to the country; and no reason can be assigned'for a distinction between the main land and islands, as to effectuating this beneficial purpose, In fact, several instances have been shewn to the Court, of patents having issued .to Connecticut claimants for-islands, and that those patents have included more than 600. acres of land; , We find, in the act of 19th March, 1810, alone, a provision that patents to be granted for lands in Bedford and Ulster townships, to Connecticut claimants, shall not exceed the quantity of 400. acres.,
I view the survey of Claverack as.comprehending the islands mentioned in the patent. This appears by. the draft approved of on 4th June, 1788 ; and the plaintiff’s return of survey evidently includes those islands. I consider the certificates of the commissioners as the strongest evidence against the commonwealth, that the- plaintiffs have, fairly *16 made out their pretensions to legal settlements, agreeably to the rules and regulations of the Susquehanna Company, to the entire satisfaction of those officers. They have been on the spot and decided on the subject under legal authority. No Connecticut claimant objects to the grant. We can intend nothing against the correctness of the facts which have been stated by the commissioners.
It is perfectly obvious that a lien on the whole of the large tract, for the full consideration money and interest, would be a more effectual security to the state, than subjecting subordinate rights or lots to the payment of their relative proportions of the purchase money.
As to including so large a quantity of land as 12,328 acres 15 perches in one patent, the plaintiff’s counsel have offered to pay such fees to the commonwealth as this Court may think just and reasonable. All things considered, it seems to me that the common and usual fees should be paid into the treasury according to the practice of the office.
The only remaining question respects the return of survey. Its defects ought to be corrected in the most easy, and least expensive mode. It is admitted that there is a capital mistake in the length of one line, which is called 133 instead of 1335 perches. It is said that this was an error in transcribing it. But there may be other mistakes in so large a survey, and it is not yet ascertained whether the survey will close upon a calculation of the courses and distances. The islands are not returned as surveyed by courses and distances. The return should be accurate and certain, whereon the grants may be made, in order to avoid injustice to the state as well as to the individuals. I have no doubt of the power of this Court to direct a re-survey, and that, under our order, the board of property or surveyor general would be authorised to take effectual measures to revise and correct any errors which may appear in the return already made$ and which, in my opinion, should be pursued in the present instance. It is our bounden duty to make such a decree as shall finally settle the dispute, and prevent further trouble to the legislature upon this subject. It never could be said that our decision was founded in law and justice, if mistakes and errors-which might be supplied and amended should be permitted to remain uncorrectcd, and the plaintiffs thereby should remain wholly remediless. My opinion on the whole matter is that *17 the plaintiffs are legally entitled to a patent for the lands comprised in the certificate of the commissioners, upon their pay-' ment of the accustomed office fees, and that an order should issue from this Court directing a re-survey, and that an accurate survey be made of the lands certified, comprehending the courses and distances of the several islands returned, previous to our final decree.
Brackenridge J. concurred with the Chief Justice.
The Court thereupon ordered a re-survey, and adjourned to the second Monday following the third Monday of May, ISIS, On that day the Court met again, but the resurvey which had been ordered by the surveyor general not being completed, another adjournment took place. On the 3d of June, 1816, the Court met at Lancaster, (present the Chief Justice and Teates J.) C. Smith Esq. appeared for Shepherd and Dorrance, and the surveyor general (Leech), and secretary of the land office (Cochran), on the part of the commonwealth. The Court, having examined the re-survey which had been in the meanwhile returned, made a decree which was approved by both parties.