## THE UNITED STATES ex rel. NOYES vs. HATCH.

1. ROCK RIVER CANAL GRANT.— The act of congress donating land to the Territory to aid in the construction of the Milwaukee and Rock River canal, authorizes the legislature to elect or appoint the persons to manage and dispose of the land.

2. CIVIL OFFICERS — EXECUTIVE.— The register and other officers appointed for the disposal of said lands are not *civil officers* within the meaning of the organic law of the Territory, and the legislature has the right to appoint them directly by naming them in the law, or to elect them under an existing law providing for that mode of filling those offices ; and the exercise of this power does not conflict with the right of the executive to appoint all civil officers.

3. SAME.— The term *civil officers*, as used in the organic law (Act of Congress of April 20, 1836), embraces only those officers in whom a portion of the sovereignty is vested, or to whom the enforcement of municipal regulations or the control of the general interests of society is confided, and does not include such officers as canal commissioners.

THIS was a motion for a mandamus. Both the relator and the respondent claim to be register of the board of commissioners of the Milwaukee and Rock River Canal Company, and the case was brought before this court to test the right to the office. The affidavit of the relator

states, that on the 22d day of February, 1842, he was appointed by the governor, register of the board of commissioners of the Milwaukee and Rock River Canal Company, and commissioned until the end of the next session of the legislature. That on the 13th of March he took the oath and gave the bond required by law, which bond was accepted and approved by the governor, and immediately entered upon the duties of his office, which he has continued to discharge ever since ; and that the respondent has in his possession the books, documents, charts and papers pertaining to the said office, and refuses to deliver them to the relator, although demanded of him, and evidence of the appointment and qualification of the relator have been exhibited to him.

By agreement of the parties, a rule to show cause was considered as having been entered, and the case was submitted upon an application for a peremptory mandamus.

The respondent showed for cause that, on the 18th day of February, 1842, he was duly elected to the said office, on joint ballot of both houses of the legislative assembly ; that he had duly taken and subscribed the oath of office required by law, and executed the requisite bond, which was approved by the district attorney for the county, and presented the same to the governor for his acceptance and approval, who refused to approve and accept said bond, on the ground, as alleged, that the respondent was not lawfully in office. The respondent insisted that having been duly elected to said office according to the provisions of the existing law, and having done all in his power to qualify himself legally, he had a right to retain the possession of said books, documents, charts and papers ; that the relator had not been appointed to said office according to law.

*A. W. Stow*, for relator :

The office of register of the board of commissioners of the canal company being created by law can only be

filled· by appointment of the governor, according to the provisions of the law organizing the Territory. The act of the legislature of 26th February, 1839, creating the office, was in accordance with this principle, and provided that the office should be filled by executive appointment. The act of 11th of January, 1840, providing for the election of the canal officers by joint ballot of both houses of the legislature, conflicts with the organic law and must be regarded as nugatory. These are civil officers, or they are not officers at all. Blackstone defines an officer to be a person clothed with authority to exercise a public employment and receive the fees and emoluments therefor. These canal commissioners exercise a public employment to which emoluments are attached by law, which the incumbents have a right to receive; they are, therefore, strictly within the definition of the term, and as their duties are purely of a civil nature, they must be civil officers, who, the organic law says, shall be appointed by the governor.

The validity of the act of 1840, under which the respondent claims the office, involves a question of much greater importance than the mere contest between individuals. The power of legislation is limited to rightful subjects. No subject is a rightful subject of legislation which conflicts with the constitution of the United States, the laws of congress, or the ordinance of 1787. It is conceived that the act of the legislative assembly of 1840 conflicts with the provisions of the organic law in prescribing the mode of filling these offices, and that, therefore, the subject is not a rightful subject of litigation; if so, the act will be declared void. The office, however, exists under the former law, and will remain. The relator has been appointed to this office in the manner pointed out in the act of congress, and is lawfully entitled to the books and papers belonging to it.

*Edward V. Whiton,* for respondent:

We contend that the canal commissioners are not

officers within the meaning of the organic law. We will examine the question.

1. Are they such officers? Certainly they are officers of some kind, but not such officers as were contemplated by the law. That law did not intend to include every person exercising any kind of public employment, such as road commissioners, bank or canal commissioners. Persons required by law to do some specific acts are not officers within the meaning of the act of congress.

2. Admitting these persons to be officers within the meaning of the organic law, the right of the executive to appoint them is superseded by the act of congress donating the canal lands. See Acts of Congress of 1838, p. 76, §§ 1, 2. Here is a donation of lands for a specific purpose, and their entire control is vested in the legislature of the Territory, or such person as the legislature may appoint. The canal commissioners are merely the agents of the Territory to execute the acts of congress and of the legislature in relation to these lands. If the governor has the right to appoint them, he has the power to remove them, and thus he might take from the legislature the control of the canal lands which was given to it by congress.

3. The power of the legislature, when exercised upon a rightful subject, can only be questioned by congress, and that body must disapprove the act before its validity can be called in question.

*J. E. Arnold*, in continuation:

This is a case of first impression. There is no precedent or authority to control the court in its decision. The question will therefore be decided upon a sound construction of the law and the reason of the law. To arrive at a correct conclusion, it is not necessary to show that the respondent was lawfully in office. The relator must show, affirmatively, that he is the lawful incumbent, and if he fails to do this he must fail in his application.

By the act of congress donating the canal lands, the Territory is made a trustee for the purposes of the act,

and the canal officers are only the agents of the Territory to fulfill that trust.

Admitting that the canal officers are civil officers within the meaning of the organic law, still, by a subsequent act of congress of equal validity, the appointment of these officers is given, according to the fairest construction, to the legislature. It will be seen upon examination, that there is a material difference in the wording of the organic law and the act donating the canal lands. By the organic law the governor is made a constituent part of the legislative assembly. The word "legislature" does not occur in that act, but the words, "legislative assembly," which means the governor, council, and house of representatives, is alone used. In the latter act, the word "legislature" is only used; and the control of the canal lands is given to the legislature, to be disposed of by that body or by such persons as it shall appoint for that purpose. It seems clear that the governor has nothing to do with filling these offices, unless the legislature gives him the authority.

*H. N. Wells,* for relator in conclusion:

There is in reality but one question involved in the case. Are the canal commissioners civil officers? If they are, the motion must be sustained. If we consider the nature of their employment, their duties and emoluments, and compare them with all legal definitions of the term "officer," the question must be decided affirmatively. The law organizing the Territory clearly vests the power of appointment in the governor, and as the law stands he can only be divested of the power by implication.

MILLER, J. This is an application for a mandamus, to compel the respondent to deliver over to the relator the books, records and papers, in, and pertaining to the office of register of the board of canal commissioners of the Milwaukee and Rock River canal. It is in reality a contest between the governor and legislature of the Ter-

ritory, respecting the power of appointing the said commissioners; and it has received from the court the deliberation and research demanded by the dignity of the parties and the great importance of the question.

By an act of congress, approved June 18, 1838, entitled "An act to grant a quantity of land to the Territory of Wisconsin, for the purpose of aiding in opening a.canal to connect the waters of Lake Michigan with those of Rock River," there was granted to the Territory for the said purpose, the odd sections along the course of the canal, and to be subject to the disposal of the legislature of the said Territory for the purpose aforesaid and no other. The said act further provides, that the commissioner of the general land office shall ascertain, under the direction of the president of the United States, the particular lands granted to the Territory, and shall cause duplicate lists of the same to be prepared from the plats on file in his office, one of which he shall transmit to the governor of said Territory, who, or such other person or persons as shall be appointed for the purpose, under the authority of the legislature of the Territory, or of the State which may be erected out of the same, after the admission of such State, shall have power to sell or convey the whole, or any part of said lands, at a price not less than two dollars and fifty cents per acre, and to give a title in fee simple therefor to whomsoever shall purchase the whole or any part thereof.

In pursuance of this act of congress, the legislative assembly of the Territory, on the 26th day of February, 1839, passed an act to provide for aiding in the construction of the Milwaukee and Rock River canal; the second section of which provided for the appointment, by the governor, by and with the advice and consent of the council, of three commissioners, to be styled the board of canal commissioners, one of whom to be designated as the acting commissioner, one as register, and one as receiver, and to hold their offices for the term of one year, subject, however, to be removed at the pleasure

of the governor. They were also to give bond, with
security, for the faithful discharge of the duties of their
office. They were also authorized to administer oaths
and examine witnesses, touching any applications for
the registry of lands under the provisions of said act.
They were also empowered in said act to make sale of
the said lands, so as aforesaid granted to the Territory.

By an act of the legislative assembly, approved on the
11th day of January, 1840, it is provided that the canal
commissioners shall be elected annually, on joint ballot
of the council and house of representatives of the Ter-
ritory, and shall hold their offices for the term of one
year, and until others are elected in their places. This
act, in this particular, superseded the act of the 26th of
February, 1839.

It is provided in an act of congress, entitled "An act
establishing the Territorial government of Wisconsin,"
approved 20th April, 1836, that the legislative power of
the Territory shall be vested in a governor and a legis-
lative assembly; and further, that the governor shall
nominate, and by and with the advice and consent of the
legislative council, appoint all judicial officers, justices
of the peace, sheriffs, all militia officers, except those
of the staff, *and all civil officers not otherwise pro-
vided for*.

Under this provision of the organic law, the relator was
appointed by the governor, regent of said board on the
22d day of February, 1842, during the recess of the coun-
cil. The respondent was elected by the legislative as-
sembly, on joint ballot, on the 18th day of the same
month, to the same office, in pursuance of the act of Jan-
uary, 1840. They both claim to exercise and hold the
same office under their respective appointments, and the
question for the determination of the court is which
appointment is legal.

The above-mentioned act of congress, making the said
grant of land, was passed more than two years after the
date of the organic law of the Territory; and they are

both of equal power, force and effect, in relation to their respective objects, and are on an equality as laws enacted by congress.   The organic law is binding upon the legislature of the Territory, as the constitution of a State is upon the action of its legislature; but it is a mere act of congress, subject to its amendment, modification or repeal.   Under the constitution, it was competent for congress to legislate directly for the Territory; but, as this would be inconvenient, and probably not consistent with the immediate or local wants or interests of the people, the Territorial government was created by the organic law, wherein the governor and legislative assembly are authorized to discharge their respective duties therein referred to, for the interest and protection of the people. Congress passed the act of June, 1838, with a full knowledge of the organic law, and of the power given therein to the governor to make appointments.   This is a law of a peculiar character for a specific purpose — a mere grant for a certain purpose not connected with the government of the Territory or with the respective functions of the governor and legislature, as directed and authorized in the organic law.   The lands granted by this act were made subject to the disposal of the legislature for the purpose mentioned in the grant; and by authority of the legislature, the governor himself, or some other person or persons, are to be appointed to make sales of these lands. In order to carry into full effect the objects and intentions of this grant, it was competent and proper for the legislature or legislative assembly to pass an act authorizing and appointing the governor to act as the commissioner, or to authorize the governor to appoint the commissioner with the advice and consent of the council, as was done in 1839, or for the election of a commissioner or commissioners on joint ballot — and such law, whatever it may be, is the proper rule of action until repealed.

This is an application to the court, to declare void the act of January, 1840, under which the respondent was appointed, on the ground that it conflicts with the organic

law. It would be the right and duty of the court to do so in a clear and manifest case. 12 Serg. & Rawle, 330; 3 id. 169; 4 Wheat. But this, in the opinion of the court, is very far from being such a case. The propriety of the act of January, 1840, in this particular, and of the election or appointment of the respondent in pursuance of it, is beyond all question or doubt.

The power of the governor to appoint the relator remains to be considered. This power is claimed for the governor by virtue of the seventh section of the organic law, in which he is authorized to nominate, and by and with the advice and consent of the council, to appoint all civil officers not therein provided for. Laying aside the position that this office of canal commissioner was not contemplated by congress at the enactment of the organic law, it may be inferred that the term *civil officers* was intended to embrace such officers as in whom part of the sovereignty or municipal regulations, or general interests of society are vested; and that such has been the general understanding in the States, under their constitutions, is known to citizens of experience and observation. But this question is not without authority of a very respectable character. On page 244 of 17 Serg. & Rawle, will be found, quoted from 3 Greenl. 482, which is not in the library, as follows: In 1822, the supreme judicial court of the State of Maine, consisting of MELLEN, Chief Justice, and PREBLE and WESTON, Justices, in an opinion given to the governor of that State, say, "that the terms *office* and *officers* are used in the constitution of Maine, where it prescribes an oath of office to all legislative, executive and judicial officers, imply a delegation of a portion of the sovereign power to, and possession of it by the person filling the office, and that a person clothed by a resolve of the legislature, with no other powers than those of superintending the public lands, and performing certain acts relating to them, under the discretionary regulation of the governor,

was not an officer, and therefore was not required to take the oath.

By section 8 of article 2, of the constitution of Pennsylvania, adopted in 1790, the governor is authorized to appoint all officers whose offices are established by the constitution, *or shall be established by law*, and whose appointments are not therein otherwise provided for.

In the case of *The Commonwealth ex rel. Lehman v. Sutherland*, 5 Serg. & Rawle, 145, which was a rule to show cause why leave should not be granted, to file an information in the nature of a quo warranto, against Joel B. Sutherland, to inquire by what authority he exercised the office of Lazaretto physician ; Chief Justice TILGHMAN uses the following language : The word *office* is of very vague and indefinite import. Every thing concerning the administration of justice, or the general interests of society, may be supposed to be within the meaning of the constitution, especially if fees and emoluments are annexed to the office. But there are matters of temporary and local concern, which, although comprehended in the term *office*, have not been thought to be embraced by the constitution. And when offices of that kind have been created, the legislature have sometimes made the appointment in the law which created them ; sometimes given the appointment to others than the governor ; and sometimes given the power of removal to others, although the appointment was left with the governor. The officers of whom I am speaking (says the chief justice), are often described in acts of assembly by the name of *commissioners*. Such, for instance, as one employed in the laying out of roads and canals and other works of a public nature. Yet all these perform a *duty*, or in other words, exercise an *office*. So, likewise, officers within the limits of a corporation are generally, appointed by the corporation, unless they concern the administration of justice. And in order to discover in what light this office of physician to the board of health has been viewed, the chief justice traced the health laws from

their origin, and satisfied himself that it had been considered, and justly considered, as an office under the control of the legislature, and subject to their modifications as to appointment, duration and removal. Judge DUNCAN, in his opinion in the same case, on page 154, says: That the power of appointment to a new office, without commission from the governor, in the law creating the office, has frequently been exercised ; as the commissioners appointed by the act of April, 1794, to settle the compensation of Pennsylvania claimants for lands within the seventeen townships of Luzerne county. The commissioners are named and appointed by the act, without any intervention of the governor, except in his legislative capacity of approving the act. These commissioners were in the nature of judicial officers, exercising important and discretionary powers and judicial functions; and although the constitutionality of many portions of that act has been called in question, yet this has never formed an objection. The enumeration of such appointments would be useless. It would be too much now to pronounce that all this was usurpation on the constitutional rights of the governor, forbidden by the constitution and void. In most cases of local appointments, they are made by the people, or by certain bodies of men authorized by the law creating the office. This act and appointment bear date but four years after the adoption of the constitution of the State. In the case of *The Commonwealth v. Douglass*, 1 Binn. 77, as early as the year 1803, it appears that Douglass had been appointed an inspector of the prison of Philadelphia in pursuance of law. The propriety or legality of the election was disputed, but not the constitutionality of the law under which it was made. Chief Justice TILGHMAN, in the case of *The Commonwealth ex rel. Reynolds v. Bussier*, 3 Serg. & Rawle, 457, says: It is understood that, in what I have said, I do not mean to include certain officers (so called, when that word is taken in its largest sense), of a local, limited or corporate nature,

which have not been supposed to be comprehended in the governor's power of appointment. By the constitution of Pennsylvania, article 5, section 2, it is declared, that the judges of the supreme court, and the presidents of the several courts of common pleas, shall not hold any other office of profit under the commonwealth. Thomas Cooper, while acting as a commissioner to settle the compensation to claimants to lands in Luzerne county, above referred to, was appointed a president judge ; and his acts as such commissioner, after he qualified as such judge, were objected to in the case of *Shepherd v. The Commonwealth*, 1 Serg. & Rawle, 1. It was there decided, that the office of commissioner, which Judge DUNCAN in the case above referred to, said was in the nature of a judicial office, exercising important and discretionary powers and judicial functions, was not an office within the meaning of the constitution.

By the same constitution, article 1, section 18, no person holding any office under the United States, or that commonwealth, shall be a member of either house of the legislature during his continuance in office. Charles Biddle, a member of the senate of Pennsylvania, was appointed, by the president of the United States, to act as a commissioner to sign bills or notes, called treasury notes, issued under the authority of the act of congress, for which he received a compensation. The question was brought before the senate, who decided that his seat was not thereby vacated. 1 Serg. & Rawle, 10. The same constitution declares the holding of offices or appointments under the State incompatible with holding or exercising offices or appointments under the United States. Under this provision, together with the laws passed in addition thereto, the supreme court of that State decided, by a majority, in the case of *The Commonwealth v. Binns*, 17 Serg. & Rawle, 219, that the selection of an editor of a newspaper to print the laws of the United States, by the secretary of state of the United States, is not conferring an office or appointment

under the United States, incompatible with the office of alderman of the city of Philadelphia.

The different acts of the legislature of Pennsylvania respecting the internal improvement system of that State from 1825 to 1829, authorized the governor to appoint the canal commissioners ; but, by the act passed in 1829, the power of the governor to appoint them was revoked, and they were appointed, in pursuance of law, by the legislature. Although the board of commissioners was clothed with immense powers in the disbursement of money and extensive patronage, it is not,. after a diligent research, to be found in the books of reports, that the governor's rights or prerogative, under the constitution, which authorized him to appoint all officers, which officers are established by that constitution, or shall be established by law; were questioned, or that the constitutionality of the law under which the legislature made the appointment, was brought to the attention of the courts. It is true that this power was afterward restored to the governor by subsequent acts of the legislature, but the precedent remains.

It would be too tedious to refer particularly to all the cases that have been decided in that State by the people, the legislature and the courts, giving a construction to the term *office*, as understood in the constitution. Many cases, cited by the judges in their opinions, in the causes above stated, and not mentioned here, are referred to.

The legislative assembly of· this Territory seems to have put the same construction on the term *office*, in the organic law, at its first session after the organization of the Territory. By an act approved on the 3d December, 1836, three commissioners were to be elected by joint ballot of the council and house of representatives, whose duty was to cause the necessary public buildings to be erected at Madison, for the accommodation of the assembly and other officers of the territorial government. The treasurer of said board, to be elected under said law, was also to give bond, with security, for the faithful discharge

of his office. Under this law commissioners were elected and qualified, as appears by the public records. This is called an office; so is the commissioner under consideration; so are those generally in the cases referred to, but it appears that they are not such officers as are contemplated by the constitutions referred to, or our organic law.

Motion for mandamus overruled.